IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LARRY J. AUSTIN, ET AL                          )
                                                )
                              Plaintiff,         )
                                                )
v.                                              ) CIVIL ACTION
                                                )
GRAHAM TAYLOR, ESQ.,                            ) 1:15-cv-49
                                                )
                              Defendant.         )
_____)

REPORTER'S TRANSCRIPT

MOTIONS HEARING

Friday, November 13, 2015

---

BEFORE:        THE HONORABLE T.S. ELLIS, III
               Presiding

APPEARANCES:   JOHN EDWARD WILLIAMS, ESQ.
               Law Office of John E Williams
               3213 Duke St
               Suite 601
               Alexandria, VA 22314

                    For the Plaintiff

               JAMES STOLL, ESQ.
               Brown Rudnick LLP
               601 13th Street NW
               Suite 600
               Washington, DC 20005

                    For the Defendant:  Trustee of the
                         Dewey & LeBoeuf Liquidated Trust

                    ---

               MICHAEL A. RODRIQUEZ, RPR/CM/RMR
                    Official Court Reporter
               USDC, Eastern District of Virginia
                    Alexandria Division

APPEARANCES CONTINUED:

          BRUCE ABBOTT, ESQ.
          Munger Tolles & Olson
          355 South Grand Ave. 35th Floor
          Los Angeles, CA 90071

               For Defendant:  Sidley Austin, LLP

          CHRISTOPHER E. ONDECK, ESQ.
          Proskauer Rose LLP (DC)
          1001 Pennsylvania Ave NW
          Suite 400 South
          Washington, DC 20004

               For the Defendant:  Proskauer Rose, LLC

          DAVID EMMETT CARNEY, ESQ.
          BRENDAN O'DELL, ESQ.
          Skadden Arps Slate Meagher & Flom LLP
          1440 New York Ave NW
          Washington, DC 20005-2111

               For the Defendant:  Deutsche Bank AG

          DENYSE SABAGH, ESQ.
          Michael Mustokoff, Esq.
          Jonathan Swichar, Esq.
          Duane Morris LLP
          505 9th Street NW
          Suite 1000
          Washington, DC 20004-2166

               For the Defendant:  Ira Akselrad, Esq.

(Court called to order at 12:25.)

THE CLERK:  Larry J. Austin, et al., versus Graham Taylor, et al.

Civil case number 1:15-cv-49.

Counsel please note your appearance for the record.

THE COURT:  For the plaintiff, who is here?

ATTORNEY WILLIAMS:  Yes, your Honor.

John Williams for the plaintiffs.

THE COURT:  All right.

And for the various defendants.

ATTORNEY STOLL:  Your Honor, James Stoll, from Brown Rudnick, on behalf of the Trustee of the Dewey & LeBoeuf Liquidation Trust.

THE COURT:  All right.

And your last name again, sir?

ATTORNEY STOLL:  Stoll, S-t-o-l-l.

THE COURT:  All right.

And, next?

ATTORNEY ABBOTT:  Good afternoon, your Honor.

Bruce Abbott, of Munger Tolles and Olson, on behalf of defendant, Sidley Austin, LLP.

THE COURT:  All right.

Next?

ATTORNEY ONDECK:  Good afternoon, your Honor.

My name is Chris Ondeck.

It is spelled O-n-d-e-c-k, from the Proskauer Rose law firm, representing defendant Proskauer.

THE COURT:  Next?

ATTORNEY CARNEY:  Good afternoon, your Honor.

David Carney, from Skadden Arps, on behalf of Deutsche Bank.  With me is Brendan O'Dell, who will address the court if need be.  He has got a pending motion for admission pro hoc vice today.

THE COURT:  I think I have already signed it.

ATTORNEY CARNEY:  Good.

THE COURT:  Thank you.

Good morning.

And, next?

ATTORNEY SABAGH:  Good afternoon, your Honor.

Denyse Sagabh, on behalf of Ira Akselrad. And I introduce my colleagues.  I am local counsel. They have pro hoc vice orders already entered, Mike Mustokoff and Jonathan Swichar.

THE COURT:  All right.

Good morning to you -- afternoon to you all as well.

Does that take care of everyone?

All right.

Who is here on behalf of Sidley?

ATTORNEY ABBOTT:  Bruce Abbott of Munger Tolles and Olson, your Honor.

THE COURT:  All right.

Thank you.

To begin with, last night at about 1:03 or this morning, about 1:03, the plaintiff filed a request do amend his answer -- his pleadings and to amend -- to add a fourth amended complaint.  Too late, it's denied. It's far too late.

Now, the matter is before the court on a motion to dismiss the third amended complaint.  And I will -- I think I am pretty clear on the arguments.

But there was no -- on the face of these complaints, there was no diversity jurisdiction.  The third amended complaint adds a RICO claim, and it is that claim that is being -- I think the argument is that that claim isn't, adequately, pled, and it is barred by the statute of limitations.

Now, its it -- that's asserted by several

defendants.  But I don't need to hear from all of you.  Presumably, one of you is prepared to speak to that issue.

ATTORNEY STOLL:  Your Honor, James Stoll again.  Yes, we had anticipated that desire on your Honor's part.  And, so, we had divided up the argument amongst ourselves, each agreeing to take one particular piece.

My piece was to be the res judicata and collateral estoppel arguments, which would apply, as well, to the RICO claim, we believe, because it arises out of the same transaction or series of transactions.

THE COURT:  All right.

Now, I understand why that's, really, the favorite of most of you all.  But who has the statute of limitations on the RICO, and the adequacy of RICO?  Let's begin there.  That's really the starting point.

But make no mistake about it, I am not blind to the fact that you all would much prefer that I deal with this on the res judicata question because, like some sort of Chinese torture, you would prefer, instead of drip, drip, drip, to have the neck cut off immediately.

ATTORNEY ABBOTT:  I could not have put that better myself, your Honor.

THE COURT:  Oh, I am sure you could have.  I hope you could have.

ATTORNEY ABBOTT:  I don't think so.

But I probably said it more times.

Good afternoon, again.  Bruce Abbott, of Munger, Tolles, and Olson, on behalf of Sidley.  And I was nominated or dragooned, I guess, as it were, to talk about the RICO issue.

So, your Honor, as you know, from the various pleadings, there are, essentially, four reasons that we believe the RICO claim on its face is unsustainable.

The first is that there is a bar under the PSLRA, and the RICO statute, for any conduct that involves the purchase or sales of securities, and for any fraud that are done in connection with that.

I think you can just look at page 19, of the third amended complaint, paragraph 78, where it alleges that the defendants advised Austin about securities; that we supervised directly, reviewed directly, and supervised competent U.S. and Chinese professionals to analyze distressed Asian assets, to see that they were authentic, to see that they had economic value, that they had a high likelihood of being profitably collected, and to close those acquisitions of all of

those assets in full compliance with the law, including U.S. tax law, and to take all necessary steps, and review the work of others, to make sure that the trades in all of these assets, had highly desirable U.S. desirable tax benefits, and were to yield cash on cash returns at 25 to 35 percent. So, that's page 19, paragraph 78, of the third amended complaint.

Now, there are many cases, your Honor. We have cited them in our brief. Probably the two most important are the Stechler case, and Seippel case, both of which dealt with tax shelter transactions; both of which had extensive discussions of the PSLRA ban, and RICO; and both of which held that in these types of cases, the purchase and sale of the securities, is an integral part of the tax shelter transactions and, therefore, the ban applies.

Now, in opposition to that argument, your Honor, the plaintiffs point to a footnote, in the Kottler case, where the court simply said that those trades were proper; that there were no improprieties in connection with the trades; and, therefore, they were quot/unquote, "incidental to the tax shelter at issue in that case."

And I think it's clear, your Honor, not just from the paragraph that I have just read to you, but

from other paragraphs in the complaint, that the trades at issue in this case were not incidental to the tax shelter scheme; that the allegations were integrally involved with the acquisition and analysis of these securities; and, therefore, under law, there is no way you can separate the purchase and the sale of the securities, and the tax shelter scheme that's alleged.

The other thing I would say, your Honor, is that if you look at the Stechler and the Seippel cases, they each have multi-page discussions of the PSLRA ban.

THE COURT:  Of the what, I am sorry?

ATTORNEY ABBOTT:  They have multiple page discussions.  So, for example, Judge Scheindlin -- Scheindlin -- excuse me -- in the Southern District of New York in the Stechler case, had a five-page discussion about the PSLRA ban in the context of a tax shelter.

And one of the things that the judge focused on correctly is that under the U.S. Supreme Court decision in Sandhoff, the in connection with language had to be applied flexibly and broadly to capture the intent of the statutory language, and the congressional history, which he also analyzed, both in that case and the Seippel decision.

And when you look at those discussions, it's

clear that Congress intended to remove from the map of RICO claims anything that had to do with the purchase and sales of securities.  And that, clearly, involves the allegations that are at issue in this case.

So, we would contend, your Honor, for that reason alone the RICO claim can't stand.  The other reason that comes up next is, actually, from the Kottler case, which they relied on in their opposition.

In the Kottler case, the court was looking at a tax shelter, again, in the context of the lawyers, the banks, the trading entities that were involved, and said that after another multiple-page discussion in this context, that there was no enterprise, as required by RICO, because there was no separate entity that was created other than the scheme.

And the same allegations are true here.  The allegations here are that every one was involved in this scheme regarding the MPL program.  But there was no separate allegation about an enterprise, nor could there be.  And under Kottler, therefore, for that reason, the RICO claim can't stand either.

The third reason the RICO claim can't stand, your Honor, which you alluded to already, was this of the statute of limitations.  So, the statute of limitations for civil RICO is four years.

Now, we know from the New York action, not just what the court found, but the allegations in that complaint, and the allegations in this complaint, that the following items put the plaintiffs on discovery notice.

First, there was a penalty interview with the IRS in October of 2003.  Then, there was a second penalty interview in September of 2008.

According to the allegations of the complaint, between 2003 and 2010, there were four separate lawsuits involving the MPL program that were directed at the plaintiffs.

And we know that in December of 2008, almost seven years ago now, Mr. Austin and Mr. Hahn were told by the IRS that they would each have to pay a million dollars in tax penalties in association with this program.

Now, even if you look in the most recent iteration of the complaint, your Honor, the plaintiffs that they have been under hash scrutiny that last for more than 12 years regarding the MPL program.

They cited to a New York Times article from 2004, which actually talked about the fact the Justice Department, the Internal Revenue Service, and the Senate Watergate Committee were all investigating the

plaintiffs in connection with these tax shelters, as well a number of the defendants here.

If you look at the Bausch case, your Honor, which we cited in our brief, the Bausch case, from the District of Maryland, in connection with the RICO claim, and connection with the standard of inquiry notice, held that inquiry notice was triggered under the statute the very first time that the IRS challenged the tax shelter at issue in that case; the very first case.

THE COURT:  You are talking about Bausch against the Philatelic Leasing?

ATTORNEY ABBOTT:  That's correct, your Honor.

THE COURT:  It's not a Maryland case.  It's a Fourth Circuit case.  It's an unpublished Fourth Circuit opinion.

ATTORNEY ABBOTT:  I stand corrected, your Honor.  I have it right here.  That's correct.  I apologize.

THE COURT:  Go on.

ATTORNEY ABBOTT:  It was an appeal from the District of Maryland.  The another case that is cited, your Honor, which is the Southern District of New York decision in Kottler, also under RICO, held that the inquiry notice trigger, under the RICO Statute, began

with the very first IRS audits of the plaintiff in that case.

So, here we have a situation where the very first IRS inquiry started in 2003.  And now were followed up by a series of additional IRS inquiries, statements to the plaintiffs that they were going to owe over a million dollars in tax penalties; New York Times articles that are in their complaint, and that they are citing to, indicating that there were investigations of them by the Justice Department, and the Senate, and the IRS, which we would argue, your Honor, clearly satisfies the trigger that's required under the RICO Statute.  So, that's the third reason.

And I'll quickly go to the fourth reason. As we set forth in our pleadings, Rule 9(b) applies in the RICO context -- that's the Baldino's Lock and Key case, and there are many others.  That issue is not disputed in the opposition papers that were filed by the plaintiffs.

We would argue that under International Courier and others, the issues conceded.  We would say, even if you wanted to look at the complaint itself, and ignore the fact that it wasn't disputed, there is no particularity at all with respect to the different defendants.

We are on our third amended complaint, not counting the New York action, and we think there is no reason to grant leave to amend, leaving aside this 1:03 in the morning pleading that was filed the other day, for them to get another bite of the apple.

THE COURT:  1:03 this morning.

ATTORNEY ABBOTT:  1:03 this morning, your Honor, correct.  So, for those reasons, the PSLRA ban is substantively infirm, it's time-barred, and it violates Rule 9(b).  We believe the RICO claim is, fundamentally, defective and has to be dismissed.

THE COURT:  All right.

Respond to that, if you would, please.  And we will take them, one issue at a time, and see how far we need to go.

ATTORNEY WILLIAMS:  Very well, your Honor.

Well, regarding the indication of the PSLRA, your Honor, and its effect on the RICO claim, whether or not the distressed the assets that were used in connection with the sheltering of the tax gain of the Furama hotel, in Los Angeles, California, were securities, plaintiffs doesn't -- don't raise violations of the securities laws in this complaint, as any part of its claims.

So, the mere fact that those distressed

assets may or may not be securities for U.S. purposes, is not relevant to our RICO claims.

So, I don't think that a PSLRA precludes a RICO claim in this case, your Honor.

THE COURT:  All right.

Any -- the other points, do you want to say anything?

ATTORNEY WILLIAMS:  Yes.

THE COURT:  Your answer was that there are not -- it doesn't have anything to do with this case.  I understand you on that point.

ATTORNEY WILLIAMS:  And under the Kottler footnote, as Mr. Abbott noted to you, it's in our papers, there are securities transactions if there were securities transactions under the securities laws of the United States were incidental to the complaint and, thus, did not provide a bar.

He also argues that there were storm warnings, if you will, giving rise to a starting of the statute of limitations clock, the four-year statute under Rotella, which is the Supreme Court decision, setting the four-year statute.

He argues that -- he and the other parties argued that there were storm warnings in 2003, 2008 of an investigation by the IRS.

Well, it is the case, your Honor --

THE COURT:  There is also a lawsuit they mentioned against one of your clients.

ATTORNEY WILLIAMS:  I'm sorry, your Honor?

THE COURT:  Wasn't there a lawsuit against one of your clients?

ATTORNEY WILLIAMS:  Which lawsuit are you referring to?

THE COURT:  One that's in their brief and that I heard about this morning.  Tell him what it.

ATTORNEY STOLL:  There were four suits filed, your Honor, by individuals who had purchased the tax shelters from Mr. Hahn and Mr. Austin, and those were pleaded in the New York complaint by the plaintiffs, and in the second amended complaint here before it was amended in a third complaint and left out.

THE COURT:  Next question.

Go ahead.

ATTORNEY WILLIAMS:  Yes, your Honor.

Now, there were those -- there were those suits filed by Mr. Hahn and Mr. Austin.  But I think as the Koch case, which is Second Circuit case under Rotella, clarifies, refines the Rotella statute of limitations rule, to say that there has to be substance to the storm warnings that would stop -- start of the

clock running.

And the Koch case -- in the Koch case, the Second Circuit makes it clear that whether or not those storm warnings caused the clock to start running, that depends on what the parties did with those warnings, whether or not there was -- whether they made an investigation.

Each time these plaintiffs made an investigation, of those kinds of warnings, they were insured by defendants that the defendants' legal opinions and advice would holdup and, I think, that should prevent those storm warnings to be -- to start the clock running on the RICO four-year statute.

THE COURT:  All right.

ATTORNEY WILLIAMS:  Similarly, your Honor, the suits against the Hahn and Austin should be similarly treated.  Those suits occurred, but these defendants, throughout the period, assured the plaintiffs that their opinions would holdup.

THE COURT:  All right.

You have the burden on the defense side. So, you can respond briefly to that, unless you have something else you want to say for the plaintiff.

ATTORNEY WILLIAMS:  Yes, your Honor.  I was going to add, your Honor, it has been cited the

assertion of a promoter penalty against both Mr. Hahn and Mr. Austin.

I am not aware of any promoter penalty asserted against Mr. Austin at all.  There was a promoter penitentiary.  I think it was mentioned it was about a million dollars.  There was none.

In fact, Mr. Austin was given a clean bill of health following an IRS investigation of possible promoter penalties -- factual promoter penalties.

He was issued a letter by the IRS that the IRS had closed that investigation without taking action. He also received a letter --

THE COURT:  That's a clean bill of health?

ATTORNEY WILLIAMS:  Yes, sir.

THE COURT:  All right.

Go on.

ATTORNEY WILLIAMS:  He also received a letter from the Justice Department that the criminal investigation, during about the same period or out of which arose the tax shelter promoter penalty investigation of the IRS, the criminal investigation of Mr. Austin was, similarly, closed by a letter that said the criminal investigation was closed by Justice without taking action.

There was a promoter penalty assessed

against Mr. Hahn.  That case is being, vigorously, defended at the moment.

THE COURT:  When was that imposed?

ATTORNEY WILLIAMS:  That was imposed in 2012.  The IRS assessed, without a notice of deficiency, promoter penalties -- tax shelter promoter penalties against Mr. Hahn.  He has been, vigorously, defending against those penalties, both with the field's office of IRS and now in the Tax Court.

The Tax Court has confirmed its jurisdiction to hear his case, on the fact of a liability for those penalties, and is going to trial next month in the Tax Court here in Washington.

THE COURT:  All right.

You can respond.

ATTORNEY WILLIAMS:  There are -- let me just say, your Honor, if I may.  There are indications, strong indications, that the IRS's case, in prosecuting those promoter penalties for 2001 and 2002, is collapsing.

THE COURT:  I am not interested in your responding to that collapsing remark.  That's not going to play any role in my decision today.  But I do want you to respond to his statements about why the statute of limitations should not bar.

ATTORNEY ABBOTT:  Yes, your Honor.

So, the very argument that you just heard from plaintiff's counsel that there were, apparently, an assuaged by statements by the defendants that there were no problems with the tax strategies and that they would be upheld is exactly the same argument that the Bausch court rejected.

In that case, when the very first IRS challenge was leveled against the tax shelters, the plaintiffs in that case contacted the defendants, who had designed the tax shelters, and the defendants told them, "Don't worry.  It's all routine.  We are going to prevail."

And, in fact, the tax shelter defendants in that case had warned the plaintiffs, before the tax shelters were entered into, that they were likely to be challenged by the IRS.

And the Fourth Circuit, as your Honor correctly pointed out earlier, rejected that and said that you are not entitled to go to the people who supposedly involved in the fraudulent scheme, ask them a question, be told that everything is okay and, as a matter of law, that ends your inquiry duty under the RICO statute.

And so the court held, as I stated earlier

in this afternoon, that under the RICO statute, your inquiry notice is triggered by of the very first IRS challenge.  And we know, both from allegations in this complaint before they amended it, from allegations in the New York action, and from exhibits that we attached to our motion to dismiss, that the very first IRS challenges in this case started in 2003, and continued through 2008, not to mention the lawsuits that we mentioned previously.

So, there are many challenges by the service.  The fact that the plaintiffs were, allegedly, told that everything is okay by the defendants is an argument that is completely unavailing under the RICO Statute inquiry notice rule.

ATTORNEY WILLIAMS:  Your Honor, if I may?

ATTORNEY STOLL:  May I add one other thing --

THE COURT:  No, you don't have a burden.  He does.  So, he gets the last word.  Is there really something that's not in your brief?

ATTORNEY WILLIAMS:  Not if you are not allowing the amendment to the opposition, your Honor.

THE COURT:  No, I precluded that.  It's too late.

ATTORNEY WILLIAMS:  It's a matter of law.

THE COURT:  It's too late.  If you have a legal point you want to make, I'll let you make.

ATTORNEY WILLIAMS:  That's what --

THE COURT:  The amendments are too late.

ATTORNEY WILLIAMS:  I have a legal argument, your Honor.

THE COURT:  For what?  For the amendments?

ATTORNEY WILLIAMS:  No, your Honor.  I have a legal argument about what counsel has just argued.

THE COURT:  All right.

Go ahead.

ATTORNEY WILLIAMS:  In the CTX Transportation, Inc., case, decided in the Fourth Circuit, it said with respect to the storm warnings, in a RICO claim, that the court should look solely to the face of the complaint, and not go beyond the face of the complaint.  That's the stage we are in right now, your Honor.

And the case law cited by opposing counsel are cases that went off at summary judgment or after trial.  So, our argument is that this court is limited to accept at face value and accept as true as you know --

THE COURT:  I can always go behind the pleadings on a statute of limitations issue, and I can

hold a hearing on that if I need to.

ATTORNEY WILLIAMS:  I can give you the cite if you would like.  The cite was the Fourth Circuit.

THE COURT:  Can you give me a cite that says that the court is not entitled on a statute of limitations question to hold a hearing?

ATTORNEY WILLIAMS:  No, sir.

THE COURT:  All right.

Because if there were, that would be the first time in my now nearly 30 years of being on the bench that that would be brought to my attention.

Now, respond to his statements.

ATTORNEY STOLL:  Thank you, your Honor.

I think counsel inadvertently made a misstatement that I want to correct that relates to what is allegedly pled.

It is not pled in the complaint, the third amend complaint, or any earlier complaint, that after the tax shelters were sold to the public in 2001 and 2002, and after the IRS began its investigation in 2003, that the plaintiff sought out the further assurances from various parties that the opinions would stand up against the IRS challenge.

That was not pled in the complaint, and it's contradicted by the allegations that are pled in the

complaint.  Specifically, with respect to the former LeBoeuf firm, Graham Taylor.  Defendant Graham Taylor was, actually, not --

THE COURT:  You mean LeBoeuf.

ATTORNEY STOLL:  LeBoeuf.  I guess I always call LeBoeuf.  But you are right, your Honor.  I get corrected all the time.

But Mr. Taylor was the attorney at LeBoeuf that participated.  He left LeBoeuf -- left LeBoeuf in 2002 and went to another law firm.  That was pled in the second amended complaint, left out in the third amended complaint.

There is no continuing representation or interaction between the plaintiff and LeBoeuf after 2002, that is pled or existed.

THE COURT:  What was the -- of the Bausch case, what was the procedural posture?

ATTORNEY STOLL:  The procedural posture -- I apologize if I get it wrong -- was that the promoter of that particular tax shelter was challenged in court by --

THE COURT:  What was the procedural posture?

ATTORNEY ABBOTT:  It was a 12(b)(6).

ATTORNEY STOLL:  It was a 12(b)(6)?  Oh, am sorry.  I understood, your Honor.  12(b)(6).

THE COURT:  Why aren't you arguing this instead of him?

ATTORNEY STOLL:  Well, I was trying to correct that factual mistake --

ATTORNEY ABBOTT:  Well, I think by getting tackled on my way to the podium would probably be a little awkward.

THE COURT:  One of you, please, not both of you.  Come back and respond to -- respond to Mr. William's argument.  And you don't have to respond to his assessment of the IRS's case.  But you do have to respond to any other points he made.  You have the burden of persuasion here.

ATTORNEY ABBOTT:  I -- I understand that, your Honor.  First of all, the case that he just cited to the court is not a case that's in his opposition brief, which is, presumably, why he offered to give you a citation from the podium.

But, secondly, as the Bausch case indicates, that's a 12(b) case.

THE COURT:  All right.  That's --

ATTORNEY ABBOTT:  That is the beginning, middle, and end of that.

THE COURT:  All right.

But what's the case you wanted to give me,

Mr. Williams, the citation to it?

ATTORNEY WILLIAMS:  It is CTX (sic) Transportation, Inc., versus Gilkison 406 Fed. Appx. 723, Fourth Circuit, 2010.

THE COURT:  And what does that case hold?

ATTORNEY WILLIAMS:  This is the case that says the court, at this stage in the litigation, should look solely to the face of the complaint.

THE COURT:  Does it involve a statute of limitations issue?

ATTORNEY WILLIAMS:  Yes, sir.

THE COURT:  And does it involve -- all right.  I will look at that case.

ATTORNEY WILLIAMS:  It's a RICO case.

May I make one comment about the face of this complaint, your Honor?

THE COURT:  Yes.

ATTORNEY WILLIAMS:  Because defendants' counsel are putting together the NPL transactions done in 2001 and '02, and the accumulation of distressed agent assets to do those deals, which is the subject of the New York litigation, with this case.

This case, if you read the complaint carefully, you will see that this case is simply a one-off -- they are claims arising out of a one-off

transaction involving a sheltering of the gain of the Furama hotel in California in 2002.

And so, the storm warnings about the MPL deals done in different context in 2001 and 2002, is irrelevant in this case.

THE COURT:  You filed a total, up to today, not counting 1:03 in the morning, you filed four complaints.  The fourth -- the third amended complaint, which is a fourth complaint, contains a RICO claim.

The previous three complaints did not include a federal claim, and there was no diversity.

Am I correct?

ATTORNEY WILLIAMS:  Well, there is no reason --

THE COURT:  It takes a, yes or no.

ATTORNEY WILLIAMS:  Yes.

THE COURT:  Am I correct?

ATTORNEY WILLIAMS:  Yes.

THE COURT:  The previous three complaints did not contain diversity jurisdiction or federal question.

ATTORNEY WILLIAMS:  I would challenge diversity.  But, nonetheless, your Honor --

THE COURT:  Why would you challenge diversity?

ATTORNEY WILLIAMS:  Well, I don't -- I don't now need to show diversity now that --

THE COURT:  Oh, you may, indeed.  Why do you think there is not diversity?

ATTORNEY WILLIAMS:  Well, you would have to look very carefully at that argument.

THE COURT:  I have.  I am asking you, why do you think there is diversity?

ATTORNEY WILLIAMS:  For purposes now, I'll concede that issue, your Honor.  There is not diversity.

THE COURT:  I am going to take a brief recess and then return.  And if I find it necessary, I will hear further argument on the other issues.

Court stands in issue.  I wouldn't hear the Simmons matter now until, let's make it 2:30.  And after this, I will hear the -- what is it, Villa?

THE CLERK:  Villa --

THE COURT:  -- Villa matter and El Tayieb.

(Court recessed at 12:58 p.m.)

(Court was called to order at 1:10 p.m.)

THE COURT:  All right.

I took the time to review, briefly, the CSX Transportation case, which was raised by the plaintiff today, though not, I think, in a brief.  Nonetheless, I have reviewed it.

Now, the facts of this case, distilled to their essence, are that plaintiff, in the 1990's, plaintiff Austin was in the business of executing corporate transactions, including mergers, and acquisitions, and sale, and lease back arrangements.

And he sought lawyers out to identify tax sufficient structures. Plaintiffs alleged that defendants associated themselves with one another to design, and implement, and help sell tax shelters, and legal opinions, in what the plaintiff called the opinion mill enterprise.

Specifically, in late 2001 through 2002, the defendants, the lawyers, served as legal counsel to plaintiffs, providing opinion letters, supporting the legitimacy of tax benefits.

And the plaintiff alleges that these opinion letters were based on assumptions defendants knew were untrue. That's the allegation. And that they earned large fees from plaintiffs and others for the fraudulent legal advice they provided to plaintiffs.

Defendant Deutsche Bank provided financing services to plaintiffs in furtherance of the scheme and earned large fees for doing so, it is alleged. The majority of plaintiffs' allegations focused on 2001 deal that plaintiff Austin made concerning the acquisition of

a distressed Asian asset from the CINDA Asset Management Company.

This acquisition is sometimes referred to in the third amended complaint as the NPL Program.  Before engaging in the deal, Austin and his business partner, Roy Hahn, became aware that many of the world's largest financial institutions were involved in transactions with four Chinese asset management companies.

And Austin and Hahn had been involved in a similar deal in the past, and they were aware that Deutsche Bank was considering closing a transaction with CINDA.  After Deutsche Bank decided the not to pursue the deal with CINDA, the Deutsche Bank agents in the Hong Kong office offered to allow Austin and Hahn to engage in the transaction by introducing them to a CINDA employee.

Many of these facts aren't necessary for the sharp focus of the issues that I am going to address. But they are important, or they are significant background.

Plaintiffs then retained Taylor, of LeBoeuf Lamb, or LeBoeuf; and Akselrad, of Proskauer; and Ruble, of Sidley, to provide legal advice concerning the 2001 Chinese transactions.

Specifically, Taylor and Ruble are alleged

to have reassured plaintiffs that the deal could be done to the standards required to make it lawful and knowable under generally accepted accounting principles and tax law, as the complaint alleges at paragraph 77.

The legal defendants provided legal -- a written legal opinion and other legal advice concerning the transaction, including participating in routine conference calls for nearly six months in 2001.

Now, the plaintiffs also alleged that Akselrad and Proskauer issued a legal opinion concerning, among other things, a personal involvement made by Austin in the Peking Investment Fund.

This legal opinion was discussed throughout December 2, 2001, and mailed to plaintiff in Austin in December -- plaintiff Austin in December of 2002.

There is also a brief reference in the third amended complaint to advice given about Dragon's -- Austin and Dragon about Dragon's possible acquisition of the stock of the Korean company, Daewoo Motors.  Third amended complaint provides no details about that advice. That's not the focus.

Thereafter, in mid-2000- -- oh, in particular, the defendants had multiple phone conversations, it's alleged, with Austin and Hahn, in which the defendants, the lawyers, represented that the

scheme was valid, legitimate, and legal under federal and state law, and that the scheme would not be subject to challenge by the IRS.

Thereafter, in mid-2002, Taylor and LeBoeuf advised plaintiffs on the so-called Furama trade, which was the distribution of plaintiff Dragon's assets to plaintiff Furama.

There was, apparently, or allegedly, rather, no discussion or warning from defendants Taylor and LeBoeuf that there was any risk that the California tax authorities could pierce the corporate veil to reach Austin's corporate assets.

Plaintiffs alleged that if any significant risk had been communicated, plaintiff Austin, would have halted the trade until such a -- until it could have within fixed or would have abandoned it.

Now, with respect to legal advice, plaintiffs alleged that by 2001, and throughout 2002, defendants had learned of a new IRS approach to trades that the IRS regarded as overly focused on tax advantages in which, likely, rendered defendants advice on, or legal opinions on the same, as worthless or inapplicable.  That's paragraph 89 of the third amended complaint, because the IRS would regard legal defendants as, quote, "Bias source, incompetence to render opinions

on legal matters relating to the tax aspects of trades that legal defendants help to create."

Plaintiffs alleged that legal defendants purposefully chose not to inform plaintiff Austin that they were placing him in legal jeopardy, and that the representations and opinions that the legal defendants have given plaintiffs were false.

And in the third amended complaint, the plaintiffs also cited June 30th, New York Times article, that's in 2004, reporting that defendant Ruble had been terminated from his law firm Sidley, and was considered by the government to be a leading promoter of abusive tax shelters, and was named in, at least, four civil lawful suits concerning allegedly abusive tax shelters.

The article also stated -- and, by the way, having cited the article, I can certainly consider it. The article also stated that the four civil lawsuits, concerning allegedly abusive tax shelters, stated that the Justice Department forced Sidley to disclose the names of clients who, since 1996, had bought 13 types of questionable tax shelters all, apparently, through Ruble's favorable opinion letters.

Now, in 2005, some of the same lawyers in this case, LeBoeuf and Sidley, were sued alongside plaintiffs' partner Hahn, and their business, Chenery,

for committing fraud, in connection with the very same tax shelter investment.  That's of the Carol against LeBoeuf Lamb case.  And it's reported at 623 Fed. Supp. 2d 504.

Thereafter, in 2008, two of the named plaintiffs pleaded guilty, or were convicted of tax resulted offenses.  On January 24th, defendant Taylor pled guilty in Utah to felony fraud in a $20 million tax fraud conspiracy case, in which defendant Taylor relinquished his licenses in California and New York -- licences to practice law and agreed to a suspended prison sentence of many years.

The prosecution of Taylor arose out of opinion letters that Taylor drafted to other investors. And on December 17, 2008, Ruble was found guilty of ten felony counts of tax evasions.

Now, in or around January 2012, the IRS issued a revenue agent's report that advised plaintiffs that the legal defendants' opinions were insufficient and that plaintiffs were, allegedly, liable for a total tax bill in excess of 14 million under California Law, over $8 million of a tax bill against plaintiff Austin individually.

Austin is also subject to outstanding federal and state tax liens of approximately $3 million

or more.  All of these losses, the plaintiffs alleged, were the result of the legal defendants' fraudulent advice concerning 2000, 2001 and 2002 tax returns.

There were six causes of action alleged in this third amended complaint -- civil RICO, and then state claims -- fraud, constructive trust, civil conspiracy, violation of the Virginia Consumer Protection Act, and violation of warranty.

Now, the procedural history is brief, but I'll recount it any way.  This case was originally filed in January of 2015.  But they didn't serve the complaint.

In May, an order issued directing plaintiffs to show cause why the case should not be dismissed understand Rule 4(m), and the plaintiffs asked for additional time to serve defendants in order to assess developments in related cases, as they put it -- case in New York.

The plaintiffs explained that there were -- a case that was originally filed in New York State Court, and that the action was filed to preserve, at least, part of the claims if the New York suit was dismissed on statute of limitations grounds.  That was not sufficient.  I didn't -- I gave them a little bit more time, but not that much.  I required them to serve

it.

So, thereafter, on July 29th, I issued an order granting leave to file an amended complaint on or before August 28th.  They filed an amended complaint, asked for additional time to file a second amended complaint.  That request was granted.  But they didn't -- they didn't make the deadline.  They were a day or so late.

They filed their complaint on September 1st.  That was the second amended complaint, asserted various state claims against defendants, but did include the RICO claim.  I allowed it to be filed a day late.

And, thereafter, on September 18th, they moved to dismiss -- the defendants moved to dismiss the second amended complaint.  The plaintiffs didn't file an opposition.  They filed a third amended complaint.

The third amended complaint included a RICO claim.  That's where we are now.  The defendants have moved to dismiss the third amended complaint.

Now, the defendants argue a number of grounds for dismissal; that is, that the plaintiff's RICO claims are barred by the statute of limitations; that the plaintiff's RICO claims failed to state a claim under 12(b)(6) and 9(b); and that plaintiff's RICO claims, even if they are adequately pled, would be

barred by the Private Securities Reform Litigation Act.

Those are the arguments that I heard today. But they also argued that the third amended complaint is barred by res judicata, an argument I did not hear today.

Now, the first argument is that the RICO claim should be dismissed because the claims are barred by the statute of limitations. It's well-settled that, of course, private RICO suits are governed by a four-year statute running from the date when the plaintiffs discovered or should have discovered the injury. That's from the Potomac Electric Power case at 262 Fed. 3d. And it cites the Supreme Court's case in Clark.

Importantly, the commencement of the limitations period need not await the dawn of complete awareness. That's the language from the Brumbaugh case. Rather, inquiry notice is triggered by evidence of the possibility of fraud, not by the complete exposure of the alleged scam. That's from the Brumbaugh case at 985 Fed. 2d.

Now, of particular relevance, I think, here is the fact that the Fourth Circuit has held, in an unpublished case, which is the Bausch opinion, that a group of plaintiffs bringing a civil RICO should have

discovered the injury when the IRS filed a challenge in the District Court to the same tax shelter giving rise to the RICO claim, even though plaintiff was not a party to that lawsuit.

Importantly, the Fourth Circuit in Bausch found that the plaintiff's RICO accrued when the IRS challenge was filed, not when an ultimate conclusion was reached.

Now, here, the defendants note that plaintiff knew or should have known about the alleged injury giving rise to the RICO claim at some point during the 2002 to 2008 period, well before January 2011, which is the date on which the RICO four-year statute would run.

Now, and the argument that the defendants make is that the plaintiffs received document requests from the IRS between 2002 and 2005, and according to plaintiff's third amended complaint, by their own language, they've been under hash scrutinize by the IRS for 12 years now.

They cited a New York Times article, which is appropriate to consider.  It's in the third amended complaint, that describes defendant's Ruble's involvement under various tax shelters under investigation and identifies four civil cases in which

Ruble was a defendant for similar activity.

Thereafter, in 2005, some of the same attorneys in this case, LeBoeuf and Sidley, were sued alongside plaintiff's partner Hahn, and their business Chenery, for committing fraud, with the very same tax shelter investment involved in this case.  That's the Carol against LeBoeuf, Lamb, Greene and MacRae case at 623 Fed. Supp. 2d 504.

Now, that case went to summary judgment, but it was filed well before the 2009 date of the opinion. A few years later, in 2008, other defendants pled guilty or were convicted of tax related crimes.

The third amended complaint alleges that on January 4th -- 24, 2008, Taylor pled guilty in Utah to a felony fraud and a $20 million tax fraud conspiracy case, in which Taylor relinquished his law licenses in California and New York, and agreed to a suspended prison sentence for many years.

And after a jury trial in the Southern District of New York, Ruble was found guilty in 2008 of ten felony counts of tax evasion.  All of that's alleged in the third amended complaint.

Plaintiffs contend that they filed suit within the four-year statute, because they were not on inquiry notice of the injury until January 2012, when

the IRS issued a revenue agent's report, advising plaintiffs that the legal defendants' opinions were insufficient and that the plaintiffs were liable for a multiple million dollars tax bill.

In my view, this is -- this contention fails.  There must -- the Fourth Circuit case law makes clear that inquiry notice is triggered by evidence of the possibility of fraud, not by the complete exposure of the alleged scam.  That's direct language from the Brumbaugh case.

Indeed, Bausch is directly on point.  In Bausch, the Fourth Circuit determined that the filing of the IRS challenge to the same tax shelter scheme, giving rise to the suit, would make an objectively reasonable person, sufficiently suspicious of the possibility of fraud and, therefore, was the date on which the RICO claim accrued.  That's the Bausch case at 1066.

I think the same is truly here.  An objectively reasonable person would have been sufficiently suspicious of the possibility of fraud, at least, by 2005, when the case in the Southern District of New York commenced.

That case not only involved fraud allegations in connection with the very same tax shelter investment.  It also involved some of the same

defendants that are named here, as well as plaintiff Austin's business partner.

(Off the record).

(Back on the record).

Well, as I said, I think Bausch is directly in point. In that case, the IRS challenge to the same tax shelter was sufficient to raise for a reasonably -- reasonable person sufficient suspicions of the possibility of fraud.

I think the same is true here. An objectively reasonable person would have been sufficiently suspicious of the possibility of fraud, at least by 2005, when the 2000 -- or when the Southern District of New York case commenced.

That case not only involved fraud allegations in connection to the very same tax shelter that's in issue here. It also involved some of the same defendants that are named here, as well as plaintiff Austin's business partner Hahn.

So, the Fourth Circuit's unpublished opinion in Bausch points, persuasively, in my view, to the conclusion that plaintiff's RICO claims occurred no later than 2004 and, therefore, this case, which was filed in January 2015, is time-barred, because it was filed long after the four years limitations bar run.

Now, today, for the first time, plaintiff calls my attention to the case of CSX Transportation against Gilkison, at 406 Federal Appendix 723.

That case, in my opinion, is distinguishable factually. Our case is -- this case is like Bausch, not like CSX. There is a statement in there that -- in this unpublished opinion, there is a concurring opinion that doesn't really have to do with the issue that's before me.

And there the court said it does not follow for the facts pled on the face of the compliant that CSX knew or should have know that the underlying asbestos lawsuits were fraudulently filed when they were filed.

Nor does reading the face of the complaint show that CSX knew or should have known of the alleged fraudulent screening scheme that went the lawsuits were filed or settled. That's very different from this case.

This case involved the same tax shelter as the 2005 filing in New York. And there isn't any extensive factual inquiry that's necessary to reach the clear conclusion that a reasonably objective person would have been on inquiry notice in 2005, when the case was filed.

So, I think the RICO claim is barred, time-barred. Now, even if the RICO claims were not

time-barred, which they are, they should also be dismissed because think failed to meet the standards of Rule 12(b)(6) and Rule 9(b).

And I would go through this, but this is less of important. It's a statute of limitations that really is important. There is a 1962(c) claim, which makes it unlawful for any person employed or associated with any enterprise to conduct, participate, directly or indirectly, in the conduct of an enterprise's affair through a pattern of racketeering activity.

So, plaintiff has to allege facts that, if accepted as true, would show that the defendants engaged in conduct of an enterprise through a pattern of racketeering activity.

I don't think the third amended complaint alleges a pattern of racketeering activity under Menasco or any of the other cases -- HJ, Inc., and the like.

Here, the third amended complaint fails to plead any alleged predicate acts, with particularity, that are a pattern. There isn't a pattern alleged.

In addition, the complaint -- the third amended complaint does not fully comply with Rule 9(b). But having said that, nor does it allege that defendants operated or managed an enterprise identifying that enterprise.

And also the 62(d) RICO conspiracy claim fails on pleading grounds.  Not only because the third amended complaint doesn't adequately allege a substantive RICO claim, but also because the third amended complaint contains no allegation that any of the defendants agreed to commit any specific predicate acts.

Plaintiffs alleged that defendants secretly entered into an agreement and conspiracy to intentionally, wrongfully, and without sufficient cause, wrongfully advised plaintiffs about their expected exposure to and personal individual liability for California fax and/or other penalties and liabilities. That's paragraphs 148 and 150.

That's a conclusory allegation insufficient to satisfy 1962(d).  And, in that regard, there are a number of cases, including the Fifth Circuit's case in Crowe against Henry.

But I don't rest on that; because, if I rested on that, I might consider, although I don't know that I would do it, I might consider giving plaintiffs leave to amend.  But I am not going to give them leave to amend, because it would be futile.  It's barred by the statute of limitations, even if they could fill the holes.

Now, an argument is made that they are also

barred by the PSLRA.  This is a developing area of the law, depends on whether -- I think the phrase is, "In connection with."

The question is whether these violations were integrally and closely related to the stock transactions, or to the advice given.  I think the fraud alleged by the plaintiff, certainly, coincided with and was related to the purchase or sale of securities.

But, the law is developing in that area, and I don't rest my decision on that.  I think it's an interesting area.  I think the face of the third amended complaint makes clear that the third transactions concern the purchase or sale of securities and, therefore, they would be barred under RICO.  That, I think, would be an alternative ruling.  But my principle ruling is statute of limitations.

Now, the question then arises that if the RICO claims are properly dismissed, the analysis properly turns on whether there is any other basis for original jurisdiction, federal question, or diversity.  There isn't.

Federal question jurisdiction does not exist, because none of the other claims in the third amended complaint arise under federal law or depend on resolution of substantial question of federal law.

Plaintiffs contend that the non-RICO claims depend on the resolutions of substantial question of federal law insofar as the case concerns allegations related to a tax shelter.

But the case, in my view, involves state law questions regarding fraud and malpractice relating to misrepresentation. There have been a number of courts that have addressed tax shelter transactions that have rejected federal question jurisdiction.

These are District Court cases, such as Stechler, in the District of New Jersey, in 2006; and Snook against Deutsche Bank, at 410 Federal Supplement 2d in Texas. So, there is no other basis for federal jurisdiction in my opinion.

The question then turns to whether there is diversity. There isn't diversity in this case. The face of the third amended complaint makes it unmistakably clear that complete diversity is lacking. There is no this diversity between plaintiff Furama, a California corporation, with its principal place in Virginia, and defendants Taylor, Sidley, and Proskauer.

Taylor is a resident of California, defendant is a Sidley partnership with 107 members who are citizens of California, and 48 of whom are citizens of Virginia.

And defendant Proskauer is a partnership with some members who are citizens in California and others who are citizens in Virginia.  There is no diversity.

Indeed, one wonders how the first and -- the complaint, the first amended complaint, and the second amended complaint could have been filed without recognizing that fact.

Now, because the RICO claim, in my view, is properly dismissed, and that there is no other basis for original jurisdiction, the only possible basis for continuing jurisdiction is supplemental jurisdiction under Section -- I beg you pardon -- 1367.  1367.

Now, pursuant to that provision, a District Court may decline to exercise supplemental jurisdiction over a claim if the District Court has dismissed all other claims over which it has original jurisdiction.

The Supreme Court has instructed that when deciding whether to exercise supplemental jurisdiction, a District Court should consider issues of judicial economy, convenience, fairness, and comity.

Plaintiffs have filed lawsuits in other places.  If the District Court finds that the balance of these factors indicates that a case properly belongs to the State Court, when the federal claims have dropped

out, then it should decline the exercise of jurisdiction and dismiss the case without prejudice to the merits, which I do.

I might point out that plaintiffs alleged Sidley to be a corporation based in New York. That's paragraph five. But that's not true. And am not bound by that allegation.

Sidley operates in the United States through Sidley Austin Holdings, LLP, and Sidley Austin US, LLP, both of which are Delaware limited liability partnerships, as well as a number of practicing partnerships.

The law is clear that in determining the citizenship of a partnership for diversity purposes, a court must look to the citizenship of all members of the partnership. That's in the Carden case in the Supreme Court in 1990 -- in fact, quoting a case that goes back to the early part of the 20th Century.

Now, the Supreme Court in that case says, "We reject the contention that to determine for diversity purposes, the citizenship of an artificial entity, the court may consult the citizenship of less than all the entity's members." In other words, you have to look at all of them.

So, I am going to grant the motion to

dismiss in part, as I have ruled on the statute of limitations issue. And provi- -- alternatively, on the PSLRA issue, but I don't feel that strongly about that one. That's still a developing area of the law. But I have no doubt about the statute of limitations.

There is no need to permit amendment for the RICO claims that are inadequately pled because they would be futile. They are barred by the statute.

So, they are dismissed, but it is dismissed without prejudice to the merits of the claims alleged. And I do not reach, contrary to the defendants' devoutly hope, I do not reach the res judicata issues that were raised.

All right. I thank counsel for your cooperation. I'll issue an order accordingly, including an order denying -- a separate order denying the post-midnight amendments that were attempted this morning.

---

                              CERTIFICATE


                 I, MICHAEL A. RODRIQUEZ, an Official Court

Reporter for the United States District Court, in the

Eastern District of Virginia, Alexandria Division, do

hereby certify that I reported by machine shorthand, in

my official capacity, the proceedings had upon the

motions hearing in the case of LARRY J. AUSTIN, ET AL.,

v. GRAHAM TAYLOR, ESQ., ET AL.


                 I further certify that I was authorized and

did report by stenotype the proceedings in said motions

hearing, and that the foregoing pages, numbered 1 to 50,

inclusive, constitute the official transcript of said

proceedings as taken from my machine shorthand notes.


                 IN WITNESS WHEREOF, I have hereto subscribed

my name this ___18TH___ day of _November_____, 2015.


                                      _____/S/_____
                                      Michael A. Rodriquez, RPR/CM/RMR
                                         Official Court Reporter